**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
ERIK H. GORDON,                                         :
                                                        :        10 Civ. 5162 (RMB)
                                   Plaintiff,           :
                                                        :        **DECISION & ORDER**
                        -against-                        :
                                                        :
SOFTECH INTERNATIONAL, INC., et al.,                    :
                                                        :
                                   Defendants.          :
---------------------------------------------------------------X

**I.      Introduction**

        On January 19, 2011, Erik H. Gordon ("Gordon" or "Plaintiff") filed an amended

complaint ("Amended Complaint") against Softech International, Inc. ("Softech"), Softech's

Chief Operating Officer Reid Rodriguez ("Rodriguez"), Arcanum Investigations, Inc.

("Arcanum"), Arcanum's President Dan Cohn ("Cohn" and, together with Softech, Rodriguez,

and Arcanum, the "Reseller Defendants"), and Aron Leifer ("Leifer" and, together with the

Reseller Defendants, "Defendants") pursuant to the Driver's Privacy Protection Act of 1994, 18

U.S.C. §§ 2721–2725 ("DPPA").[1]  Gordon alleges that Leifer obtained Gordon's personal

information (through the Reseller Defendants' services) from the New York Department of

Motor Vehicles ("DMV") for the impermissible use of (Leifer) placing "a series of phone calls

designed to harass, threaten and annoy" Gordon in violation of the DPPA.  (Am. Compl. ¶¶ 72–

86, 94.)  Gordon alleges that the Reseller Defendants also violated the DPPA, notwithstanding

that Leifer represented and certified to the Reseller Defendants that he was "requesting the

information pursuant to a [DPPA] permissible use."  (Am. Compl. ¶¶ 34–35, 81.)  At oral

---
[1]        The Complaint also named John Does 1-5 and ABC Corporations 1-5 as defendants, none
of whom has appeared in this action.  (See Am. Compl., dated Jan. 5, 2011, ¶¶ 16–17.)

argument held on November 22, 2011, Gordon's counsel stated, "I think [the Reseller

Defendants] are strictly liable" under the DPPA.  (Hearing Transcript, dated Nov. 22, 2011

("Oral Arg. Tr."), at 5:11–14; 7:8–12 (THE COURT: "You are saying it's a strict liability

statute[?]"  PL. COUNSEL: "I think that's how the statute reads, that's correct.").)

      Gordon also asserts state law claims of <u>prima facie</u> tort and intentional infliction of

emotional distress against Leifer, alleging that Leifer's "series of threatening phones calls"

caused Gordon to experience "emotional distress" and "fear for his safety as well as the safety of

his family and employees."  (Am. Compl. ¶¶ 88, 90, 94, 96.)[2]

      On June 8, 2011, Arcanum and Cohn filed cross-claims against Leifer for common law

indemnification, contractual indemnification, and contribution, alleging that Leifer's "primary

carelessness, recklessness or affirmative acts of omission or commission" caused Plaintiff's

damages, if any, and that Leifer had signed a written indemnity agreement.  (Arcanum & Cohn's

Answer, dated June 8, 2011, ¶¶ 39–40.)  On June 9, 2011, Softech and Rodriguez also filed

cross-claims against Leifer for common law indemnification, contractual indemnification, and

contribution, alleging that Leifer's "negligent, reckless, wanton, willful and/or intentional acts"

---

[2]     As described <u>infra</u> Section II, Gordon's claims arise out of an unusual and unfortunate
incident that occurred on October 10, 2009 on East 61st Street in Manhattan, New York
(between the hours of 11:00 p.m. and 1:30 a.m.).  The incident seems to have involved Leifer,
who is "involved" in the operation of a business called "Hot Local Escorts," Gordon's driver,
Tom Harris ("Harris"), and a female friend of Leifer.  Harris contends that while Gordon was in
a nearby restaurant, Leifer's female friend approached Gordon's (London-style) taxicab.
Leifer's friend allegedly "asked [Harris] about the car," and Harris allegedly declined to answer
her questions.  Harris contends that Leifer thereafter threatened Harris for being "mean" to
Leifer's friend, that Harris drove away, and that Leifer gave chase in his white SUV.  Leifer
contends that he drove away in order to drop his friend off at a hotel, and that Gordon's cab
(driven by Harris) hit Leifer's white SUV.

     Leifer also contends that after the October 10, 2009 incident, he was trying to reach
Gordon by phone (using Gordon's license plate number) to resolve insurance matters regarding
the alleged car accident.  Harris contends that there was no car accident.

caused Plaintiff's damages, if any.  (Softech and Rodriguez's Answer, dated June 9, 2011, ¶¶ 11–12.)[3]

On August 12, 2011, Defendants filed a joint motion for summary judgment against Gordon pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing, among other things, that (1) Leifer represented and certified that his permissible use of Gordon's DMV information was "to obtain Plaintiff's insurance information" and "to perform [an] investigation in anticipation of litigation"; (2) the Reseller Defendants disseminated DMV information for a permissible use under the DPPA based upon, among other things, Leifer's written certification; (3) Plaintiff's <u>prima</u> <u>facie</u> tort claim against Leifer fails because Plaintiff has failed to show that Leifer's "sole motivation was 'disinterested malevolence'" as required under New York law; and (4) Plaintiff's intentional infliction of emotional distress claim against Leifer fails because Leifer's conduct does not "rise to the level of 'outrageous conduct,'" and because Plaintiff's "few sleepless nights" do not constitute severe emotional distress.  (Defs.' Mem. of Law in Supp. of Joint Mot. for Summ. J. by Defs., dated Aug. 12, 2011 ("Defs. Mem."), at 1, 16, 19–20.)[4]

On September 5, 2011, Plaintiff filed an opposition to Defendants' motion and also cross-moved for summary judgment (on his DPPA claims only), arguing that (1) Leifer "cannot credibly claim" that his permissible use under the DPPA was to obtain Gordon's insurance information or to conduct an investigation in anticipation of litigation because "[n]o . . . collision

---

[3]     On July 13, 2011, Leifer filed cross-claims against the Reseller Defendants for common law indemnification and contribution, alleging that their wrongful conduct was "primary and/or active," while any wrongdoing by Leifer was "secondary and/or passive."  (Leifer's Answer, dated July 13, 2011, ¶¶ 1–2.)

[4]     At oral argument on November 22, 2011, Leifer's counsel argued that "Mr. Leifer indicated his purpose in contacting plaintiff was to get insurance information so that he could either resolve a claim or commence a claim.  There is no other evidence that [Leifer] had any other basis whatsoever."  (Oral Arg. Tr. at 15:10–14.)

took place" between Gordon's taxicab and Leifer's SUV on October 10, 2009; (2) the DPPA "does not contain an intent requirement" and, therefore, the Reseller Defendants are strictly liable, i.e., according to Gordon, they could not have had a permissible use because Leifer did not (ultimately) have a permissible use, notwithstanding that Leifer "communicated [and certified] a permissible purpose" in seeking to obtain DMV information; (3) "there is ample evidence to demonstrate that [Leifer] intended to cause Gordon emotional harm"; and (4) Leifer's phone calls, "in particular, his call to Gordon's ill mother in which he alleged that Gordon had been involved in a sexual assault," constituted extreme and outrageous conduct that caused Gordon "pain and suffering." (Pl.'s Mem of Law in Opp'n to Defs.' Joint Mot. for Summ. J. and in Supp. of Pl.'s Cross-Mot. for Summ. J., dated Sept. 5, 2011 ("Pl. Opp'n"), at 4, 14, 16–17, 21, 24–25.)

On September 12, 2011, Defendants filed a reply and opposition to Plaintiff's cross-motion, arguing, among other things, that the Reseller Defendants "properly relied upon Leifer's stated permissible use" and that, under Gordon's interpretation of the DPPA, a reseller would be (strictly) liable for any "misinformation by the end user," which is not what the DPPA provides. (See Reply Mem. of Law in Further Supp. of Defs.' Joint Mot. for Summ. J. and in Opp'n to Pl.'s Cross Mot. for Summ. J., dated Sept. 12, 2011 ("Defs. Reply"), at 3, 7.) As noted, oral argument was held on November 22, 2011. (See Oral Arg. Tr.)

**For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part, and Plaintiff's cross-motion for summary judgment on his DPPA claims is denied.**

## II.    Background

The following summary reflects facts which are undisputed and some that are disputed (as noted).

Gordon owned a "London-style taxi cab" that carried a New York State license plate registered in his name.  (Defs.' Joint Response to Pl.'s Statement of Material Facts in Supp. of the Cross Mot. for Summ. J. Pursuant to Local Civ. R. 56.1, dated Sept. 12, 2011 ("Defs. 56.1 Response"), ¶¶ 1, 3.)  On October 10, 2009, Gordon's cab was parked on East 61st Street in Manhattan, New York.  (See Pl.'s Response to Defs.' Local Civ. R. 56.1 Statement of Material Facts, dated Sept. 5, 2011 ("Pl. 56.1 Response"), ¶¶ 9–10, 25.)  Gordon's driver, Harris, was waiting in the cab while Gordon was in a nearby restaurant.  (See Pl. 56.1 Response ¶¶ 9–10, 25.)  Leifer, who is involved in the operation of a business called "Hot Local Escorts," was parked nearby in a white SUV with an unnamed female friend.  (Pl. 56.1 Response ¶¶ 9–10; Deposition Transcript of Aron Leifer, dated July 12, 2011 ("Leifer Tr."), at 30:12–40:25.)  Between approximately 11:00 p.m. and 1:30 a.m., Leifer's friend approached Gordon's cab and allegedly "asked [Harris] about the car."  (Pl. 56.1 Response ¶ 25; Deposition Transcript of Thomas Harris, dated Mar. 15, 2011 ("Harris Tr."), at 24:23–25:7; 30:17–22.)  The actual content of the conversation between Harris and Leifer's friend is in dispute.  Leifer contends that Harris was "mean" to Leifer's friend, while Harris contends that it was Leifer's friend who was "mean."  (Pl. 56.1 Response ¶ 26.)[5]

---

[5]    At his deposition, Harris testified as follows: "**A.** A woman came up to the car.  It's a right-hand drive car.  She came to the right-hand side and she asked me about the car.  And I said -- I had some words with her about the car.  **Q.** And what do you recall the words were?  **A.** Something to the effect that, I get spoken to a lot about the car, and I really don't like talking about the car. . . .  And she said, well, you're mean.  Or you're really mean or something like that.  And I said something like, if anybody's mean here, Ms., Madame, whatever, you are.  And

Leifer then approached Gordon's cab—and what happened next is also very much in dispute.  (Pl. 56.1 Response ¶ 27.)  Harris says: "And the next thing I know, this – the man [presumably Leifer] that she emerged from one of the restaurants with came barging across the street, and I drove away.  And as I was driving away, he said to me, and I quote, 'I am going to fuck you up.'  And he got in his car and followed me."  (Harris Tr. at 25:8–26:5.)  Leifer contends that he wanted "to ascertain why [Harris] acted in that fashion."  (Pl. 56.1 Response ¶ 13.)  Harris and Leifer each appear to have begun to drive down East 61st Street.  (Pl. 56.1 Response ¶¶ 13–14.)  Leifer contends that he started driving "to drop [his] friend off at a hotel," and that Harris "engaged in a game of starting and stopping."  (Pl. 56.1 Response ¶¶ 14, 16.)  Harris contends that he started driving "to get away from Leifer," and that "Leifer gave chase." (Pl. 56.1 Response ¶¶ 15–16.)  Leifer contends that, as they were driving, "contact occurred between some portion of the London Cab and Leifer's vehicle[]," while Harris contends that he "never got into an accident or collision."  (Pl. 56.1 Response ¶ 17.)

Leifer "wrote down the license plate number" of Gordon's cab.  (Defs. 56.1 Response ¶ 1.)  And, on October 11, 2009, Leifer submitted Gordon's license plate number to Docusearch.com in order to obtain information associated with the license plate number.  (See Defs. 56.1 Response ¶ 4.)  Docusearch.com is Arcanum's online website, and Arcanum is a licensed "private investigation firm," which is wholly owned and operated by Cohn.[6]  (Pl. 56.1 Response ¶¶ 6–8; Defs. 56.1 Response ¶¶ 4, 19–20; Affidavit of Dan Cohn, dated Feb. 9, 2010, ¶¶ 4–5.)  The Docusearch.com website advises users that "[t]here are restrictions to requesting

---

she walked away.  She went across the street.  And [went to] a white SUV, I would call it." (Harris Tr. at 25:8–26:5.)

[6]     Under the DPPA, "use by any licensed private investigative agency or licensed security service for any purpose permitted under [§ 2721(b)]" is a permissible use for obtaining or disclosing information from a motor vehicle record.  18 U.S.C. § 2721(b)(8).

license plate information."  (Joint Declaration of Jura C. Zibas, Gregory R. Saracino & Vincent

Chirico, dated Aug. 12, 2011 ("Zibas Decl."), Ex. O.)  Next to that statement is a link labeled

"DPPA Permissible Purpose," which brings users to another webpage that states in relevant part,

"[p]ursuant to the Driver's Privacy Protection Act of 1994 (DPPA), you may only access vehicle

registration information for one of the following permitted uses."  (Zibas Decl., Ex. P.)  The

webpage lists a number of permissible uses of DMV information under the DPPA and also states

in relevant part:

> You will be required to select a DPPA Permissible Purpose when
> placing your order.  By inputting your response, you hereby certify
> to Docusearch.com that you are in, and assume full responsibility
> for, compliance with the DPPA and you agree to indemnify,
> defend and hold Docusearch harmless from any breach of the
> DPPA by you . . . .

(Id.)  The Docusearch.com website required Leifer to select from a list of "permissible use[s]"

using a drop-down menu.  (Pl. 56.1 Response ¶¶ 82–83; see Declaration of Justin M. Sher, dated

Sept. 5, 2011 ("Sher Decl."), Ex. Q.)  The website also required Leifer to enter into an online

agreement, which states in relevant part:

> **Client represents and warrants that it will provide Docusearch**
> **with accurate and complete information regarding the**
> **searches requested, and that search results will not be used for**
> **any purpose other than the purpose stated to Docusearch.**

(Pl. 56.1 Response ¶¶ 83, 86 (emphasis added).)  Leifer selected "Insurance Other" as the

permissible use from the drop-down menu; he also checked the box signifying his agreement to

the online contract.  (Pl. 56.1 Response ¶¶ 84, 87–88; Zibas Decl. Ex. S.)  He thereafter paid the

required $39.00 fee by credit card and submitted his request for information.  (Pl. 56.1 Response

¶¶ 38, 84, 87–89.)

Arcanum, in turn, submitted Leifer's search request to Softech.  (Pl. 56.1 Response ¶ 90; Defs. 56.1 Response ¶ 21.)  Softech "is in the business of information gathering and obtaining information from the department of motor vehicles."  (Pl. 56.1 Response ¶ 2.)  Arcanum and Softech have a Vendor Agreement, dated July 5, 2005 ("Vendor Agreement"), which provides in relevant part that Arcanum

> hereby certifies that it will request the Records and the information therein from Softech and resell such to the End Users solely for said End Users' use in connection with a permissible purpose under the . . . DPPA. . . .  [Arcanum] further warrants that it will require by written contract that its End Users comply with the same obligations of compliance with laws.

(Sher Decl., Ex. D at 6.)  The Vendor Agreement contains an indemnification provision that states in relevant part that Arcanum "will indemnify, defend, and hold Softech harmless from and against any and all liabilities . . . arising out of or resulting from the use, disclosure, sale or transfer of the Records (or information therein) by [Arcanum] or its End Users."  (Sher Decl., Ex. D at 8.)

On October 12, 2009, Softech's automated computer system processed Arcanum's search request, among other things, verifying Arcanum's status as a licensed private investigation firm, and submitted the request to the DMV.  (Defs. 56.1 Response ¶ 26; Deposition Transcript of Reid Rodriguez, dated Feb. 16, 2011 ("Reid Tr."), at 71:5–16, 81:12–86:2.)  Thereafter on that same day, the DMV disclosed Gordon's name, address, driver's license number, driver's license expiration date, and vehicle make and model to Softech, which disclosed the information to Arcanum, which in turn disclosed the information to Leifer.  (Defs. 56.1 Response ¶¶ 26, 33, 35; Sher Decl. Ex. A.)  Leifer used Gordon's name and address to conduct internet searches and to obtain "phone numbers associated with [Gordon]."  (Pl. 56.1 Response ¶ 39; Defs. 56.1 Response ¶ 36.)

On October 12 and 13, 2009, Leifer placed five or more phone calls to various numbers associated with Gordon, including to Gordon's mother, Gordon's assistant, and Gordon's father's assistant.  (See Pl. 56.1 Response ¶¶ 51–54, 67–68; Defs. 56.1 Response ¶ 37.)  Gordon stated at his deposition that during a phone call to Gordon's mother, Leifer stated that he wanted "to get in touch with [Gordon] and said that there had been a sexual assault in the back of [Gordon's] car, [and] that if [Gordon] didn't get in touch with [Leifer] immediately [Gordon] would be in big trouble."  (Deposition Transcript of Erik H. Gordon, dated Feb. 9, 2011 ("Gordon Tr."), at 62:5–13; see Pl. 56.1 Response ¶ 67.)  Gordon's assistant testified at his deposition that during a call to him, Leifer stated that "he had just gotten off the phone with [Gordon's] mother . . . and he would go to the media.  And when stupid people hire stupid people, that's when people get hurt."  (Deposition Transcript of Travis Braha, dated Mar. 30, 2011 ("Braha Tr."), at 32:12–33:23; see Pl. 56.1 Response ¶ 53.)

Leifer contends that he "tried to contact Plaintiff to discuss the automobile accident" and "tried different ways to coax him into coming to the phone without mentioning the automobile accident."  (Pl. 56.1 Response ¶¶ 40, 45.)  Gordon contends that the calls were "threatening" and that he "feared for his safety."  (Defs. 56.1 Response ¶ 40.)

## III.   Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] court must resolve all ambiguities and draw all reasonable inferences against the moving party."  Cowan v. Ernest Codelia, P.C., 149 F. Supp. 2d 67, 71 (S.D.N.Y. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"'The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'"  Id. at 70–71 (quoting Gallo v. Prudential Residential Servs. Ltd. P'Ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).  "[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Id. at 71.

The DPPA "carves out both mandatory and permissive exceptions to the general prohibition[]" against obtaining and disclosing personal information from motor vehicle records. Roth v. Guzman, 650 F.3d 603, 606 (6th Cir. 2011).  Personal information shall be disclosed for, among other things, "use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, [and] motor vehicle product alterations, recalls, or advisories" to carry out the purposes of the Automobile Information Disclosure Act, 15 U.S.C. §§ 1231 et seq., and the Clean Air Act, 42 U.S.C. §§ 7401 et seq.  See 18 U.S.C. § 2721(a).  Further, persons may obtain or disclose such information "for any of the permissible uses or purposes listed in § 2721(b)(1)–(14)."  Roth, 650 F.3d at 606.[7]

---

[7]     The fourteen permissible uses under the DPPA are:

(1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

(2) For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including survey research; and removal of non-owner records from the original owner records of motor vehicle manufacturers.

(3) For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only—

## IV.     Analysis

### (1)     DPPA Claim against Leifer

Leifer argues that he used Gordon's information for the permissible purpose of

"obtain[ing] Plaintiff's insurance information" and/or "perform[ing] [an] investigation in

---

(A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and
(B) if such information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual.
(4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.
(5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals.
(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.
(7) For use in providing notice to the owners of towed or impounded vehicles.
(8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.
(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49.
(10) For use in connection with the operation of private toll transportation facilities.
(11) For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.
(12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.
(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.
(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety.
18 U.S.C. § 2721(b).

anticipation of litigation" presumably in relation to the alleged October 10, 2009 car accident. (Defs. Mem. at 1.)  Gordon responds that Leifer "cannot credibly claim" that his permissible purpose was to obtain Gordon's insurance information or to conduct an investigation in anticipation of litigation because, among other reasons, "[n]o such collision took place."  (Pl. Mem. at 4, 21.)

The DPPA provides in relevant part:

> A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

18 U.S.C. § 2724(a).[8]  As noted at supra Section III, Section 2721(b) enumerates fourteen permissible uses for obtaining or disclosing personal information.  See 18 U.S.C. §§ 2721(b)(1)–(14); Reno v. Condon, 528 U.S. 141, 145 & n.1 (2000).  The permissible uses relevant here are:

> (4)     For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.
> . . .
> (6)     For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.

18 U.S.C. §§ 2721(b)(4), (6).[9]

---

[8]     The DPPA also provides for criminal enforcement: "It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under [§] 2721(b)."  18 U.S.C. § 2722.

[9]     One court has held that, under § 2721(b)(4), an "investigation in anticipation of litigation" occurs where "(1) [the user] undertook an actual investigation; (2) at the time of the investigation, litigation appeared likely; and (3) the protected information obtained during the

Summary judgment is not available (to either Leifer or Gordon) on Gordon's DPPA claims against Leifer.  Material questions of fact appear to exist regarding Leifer's obtainment and use of Gordon's DMV information because Gordon and Leifer sharply dispute, among other things, whether any car accident ever occurred on October 10, 2009.[10]  These questions must be resolved by a jury.  See Cowan, 149 F. Supp. 2d at 79–80.

Leifer contends that "contact occurred between some portion of [Gordon's] London Cab and Leifer's vehicle[]" on the night of October 10, 2009, which justified his efforts to obtain information "to submit an insurance claim" and "to perform [an] investigation in anticipation of litigation."  (Pl. 56.1 Response ¶¶ 17, 21; Defs. Reply at 5.)  Gordon asserts that Harris "never got into an accident or a collision" with Leifer, which is allegedly corroborated by Leifer's acknowledgement "that his SUV was not damaged" and by the alleged facts that Leifer never filed an insurance claim or a police report.  (Pl. 56.1 Response ¶ 17; Pl. Mem. at 19; Defs. 56.1 Response ¶¶ 14, 16.).  Leifer contends that, after placing the October 12 and October 13, 2009 phone calls, his friend observed the damage to Leifer's vehicle and repaired it, obviating the "need for an insurance claim."  (Pl. 56.1 Response ¶¶ 47, 48.)

### (2)    DPPA Claim against the Reseller Defendants

The Reseller Defendants argue that they cannot be held liable under the DPPA because they disclosed DMV information (only) for a permissible use, namely, for use in insurance

---

investigation would be of 'use' in the litigation."  Pichler v. UNITE, 339 F. Supp. 2d 665, 668 (E.D. Pa. 2004).  The parties contest whether Leifer could qualify as "a self-insured entity" under § 2721(b)(6).  (See Pl. Mem. at 19–20; Defs. Mem. at 5.)  Summary judgment as to that legal question is denied without prejudice, and the parties may raise the issue in a (subsequent) motion in limine just before trial.

[10]    As noted supra n.4, Leifer's counsel stated at oral argument, "Mr. Leifer indicated his purpose in contacting plaintiff was to get insurance information so that he could either resolve a claim or commence a claim.  There is no other evidence that [Leifer] had any other basis whatsoever."  (Oral Arg. Tr. at 15:10–14.)

claims investigation and private investigation.  They argue that they relied upon Leifer's

assurance (i.e., his written certification) that he had a "permissible purpose" (and only a

permissible purpose) in seeking DMV information from them.  (Defs. Mem. at 7.)[11]  **Indeed, no**

**party contends that the Reseller Defendants had an impermissible use when they provided**

**DMV information to Leifer.**  (See Oral Arg. Tr. at 10:7–12 (THE COURT: "You can't possibly

imagine that these resellers had the same impermissible purpose that Leifer [allegedly] had."  PL.

COUNSEL: "Did they know Mr. Leifer was going to pick up the phone and use this information

to contact Mr. Gordon's family and associates and harass them, no, I don't think they did.").)

Gordon contends that Leifer's stated and certified permissible use was contrary to his

presumably intended impermissible use but also that the Reseller Defendants should be "strictly

liable" for Leifer's impermissible use, if any.  (See Oral Arg. Tr. at 5:11–14 (THE COURT:

"You are saying it's a strict liability statute."  PL. COUNSEL: "I think that's how the statute

reads, that's correct.").)  The Reseller Defendants contend persuasively that, under Gordon's

interpretation of the DPPA, a reseller would be (strictly) liable for any "alleged misinformation

by the end user," or even for an end user's subsequent change of mind from a permissible use to

an impermissible use.  (Defs. Reply at 7; see Oral Arg. Tr. at 15:21–16:1.)  Gordon argues that

the "[t]he DPPA authorizes the resale of information only if there is an actual, not just a stated,

permitted use," and that the DPPA does not contain "an intent or knowledge requirement."  (Pl.

Mem. at 14, 16–18.)  Gordon argues further that, if "Leifer lacked a permissible use," the

Reseller Defendants also lacked a permissible use, notwithstanding Leifer's certification of a

---

[11]    That is, Arcanum and Cohn relied on Leifer's representation and certification that he
sought the information for a permissible use, and Softech and Rodriguez relied on Arcanum and
Cohn's representation and certification that Leifer had represented and certified a permissible
use.  See supra Section II.

permissible use.  (Pl. Mem. at 21; see Oral Arg. Tr. at 9:25–10:2 (THE COURT: "You are saying that the purpose of Leifer is the purpose of the reseller."  PL. COUNSEL: "True.").)

Whether a reseller may be liable under the DPPA for an alleged but undisclosed impermissible use of driver information by an end user where a permissible use has been asserted and certified by the end user appears to be a question of first impression in this Circuit. The United States Court of Appeals for the Sixth Circuit, however, addressed a similar issue in Roth v. Guzman, 650 F.3d 603 (6th Cir. 2011), and ruled in favor of the defendants by finding them not liable for the undisclosed impermissible use of the requester.[12]  In Roth, a class of licensed drivers sued state officials of the Ohio Department of Public Safety and the Ohio Bureau of Motor Vehicles, alleging that the defendants made "bulk disclosures of personal information from motor vehicle records" to a reseller who had made express written representations that it had a permissible use (but presumably had a hidden or undisclosed impermissible use).  Id. at 608–10 (internal quotation marks omitted).  The Roth court reversed the lower court's denial of the defendant's motion to dismiss and held that the defendant state officials could not be held liable "for a knowing disclosure made for a permissible purpose any time the purpose was misrepresented or the information was later misused or improperly redisclosed by the requester or any other entity."  Id. at 611.

Although Roth also addressed the issue of qualified immunity of state officials, its conclusion that the DPPA is not "essentially a strict liability statute" is relevant and persuasive here.  Id.  The Sixth Circuit reasoned that "[i]f no distinction is made between the [permissible] use for which the defendants disclosed the information, and the undisclosed use for which it was

---

[12]      Neither party cited Roth in its briefs.  (See Oral Arg. Tr. at 2:9–12 (THE COURT: "[D]id you mention the Roth case."  PL. COUNSEL: "I don't believe we mentioned it."); 13:2–4 (THE COURT: "Did you cite the Roth case yourselves."  DEFS. COUNSEL: "I don't think we did.").)

obtained, subsequently misused or impermissibly redisclosed by the recipient, the DPPA

becomes essentially a strict liability statute." Id. In reaching its conclusion, the Sixth Circuit

distinguished Pichler v. UNITE, 542 F.3d 380 (3d Cir. 2008), and Rios v. Direct Mail Express,

Inc., 435 F. Supp. 2d 1199 (S.D. Fla. 2006), where the courts held that the DPPA "does not

require proof that a defendant had any appreciation that its conduct was impermissible." Pichler,

542 F.3d at 396; see Rios, 435 F. Supp. 2d at 1204–05. The Sixth Circuit found that Pichler and

Rios did not address the question presented because

> [i]t is one thing to say that a defendant's ignorance that his own
> conduct violates the law is not a defense, but it is another, we
> think, to conclude that a defendant is liable for a knowing
> disclosure made for a permissible purpose any time the purpose
> was misrepresented or the information was later misused or
> improperly redisclosed by the requester or any other entity.

Roth, 650 F.3d at 611.[13]

This Court agrees with the Sixth Circuit's reasoning and finds that because the Reseller

Defendants knowingly disclosed personal information from a motor vehicle record for a

(certified) permissible use (i.e., based upon the representation and certification that the

information was requested for a permissible use), such Defendants are not strictly liable if the

use turns out to have been misrepresented or the information was later misused or improperly

redisclosed by the end user, i.e., in this case, Leifer. See id.; 18 U.S.C. § 2724(a). Here, the

Reseller Defendants had a permissible use under the DPPA for obtaining and disclosing

Gordon's DMV information based upon Leifer's written representation and certification that his

use was permissible (i.e., his selection of "Insurance Other" as his permissible use on the

---

[13]    This Court also believes that Pichler and Rios are inapposite because they were not suits
seeking to impose liability against resellers for the impermissible use of an end user but, instead,
were suits against end users who claimed that they did not know that their use was
impermissible. See Pichler, 542 F.3d at 383–84; Rios, 435 F. Supp. 2d at 1201.

Docusearch.com website) after Leifer was warned about the DPPA's permissible use restrictions. (Pl. 56.1 Response ¶¶ 84, 87–88; Zibas Decl. Ex. S); see Roth, 650 F.3d at 611.  Where Congress sought to strike "a critical balance between the legitimate governmental and business needs for this information, and the fundamental right of our people to privacy and safety," 139 Cong. Rec. S15763 (1993), the DPPA cannot, on the facts presented here, be considered "essentially a strict liability statute," Roth, 650 F.3d at 611.

**Accordingly, the Reseller Defendants' motion for summary judgment against Gordon is granted.**

**(3)** **Prima Facie Tort**

Leifer argues that "Plaintiff has failed to allege or prove that any phone calls by defendant Leifer were made with malevolent intent."  (Defs. Mem. at 17.)  Gordon responds that "there is ample evidence to demonstrate that [Leifer] intended to cause Gordon emotional harm." (Pl. Mem. at 25.)

In New York, the elements of a prima facie tort claim are "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful."  Mugavero v. Arms Acres, Inc., No. 03 Civ. 5724, 2009 WL 890063, at *25 (S.D.N.Y. Mar. 31, 2009) (quoting Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 571 (2d Cir. 1990).  The defendant's intent must be "disinterested malevolence." Twin Labs., 900 F.2d at 571.  "[S]pecial damages must be alleged with sufficient particularity to identify actual losses . . . .  [R]ound sums without any attempt at itemization are insufficient." Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283, 306 (S.D.N.Y. 2005).

Leifer is not entitled to summary judgment against Gordon.  Material questions of fact exist as to, among other things, whether Leifer's motivation in calling Gordon's family and associates on October 12 and 13, 2009 was disinterested malevolence (elements one and three). See Mugavero, 2009 WL 890063, at *26.  Leifer asserts that he called Gordon's phone numbers to "obtain information to submit an insurance claim."  (Pl. 56.1 Response ¶ 21.)  Gordon counters that there was never "an accident or collision," pointing out, as noted, that "Leifer never filed an insurance claim" and "never filed a police report."  (Pl. 56.1 Response ¶¶ 16–17; Defs. 56.1 Response ¶¶ 14, 16.)  Whether Leifer's motivation was intentionally to inflict harm through allegedly threatening statements over the phone, such as "Gordon [was] involved in a sexual assault" and "when stupid people hire stupid people, that's when people get hurt," should be determined by a jury.  (Braha Tr. at 32:12–33:23; Gordon Tr. at 62:5–13); see Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995); Sadowy v. Sony Corp. of Am., 496 F. Supp. 1071, 1075 (S.D.N.Y. 1980).

As to the second element, Leifer argues that "Plaintiff has failed to sufficiently plead" special damages.  (Defs. Mem. at 16.)  Gordon counters by submitting an (unrebutted) accounting, dated April 19, 2009, indicating that Gordon's "economic damages are $2,214,627." (See Sher Decl., Ex. L.)  The accounting contains schedules itemizing Gordon's past and projected security costs.  (See id. at 1.)  While the ultimate amount of damages, if any, will be an issue for trial, Gordon has offered sufficiently particularized evidence of special damages to survive summary judgment.  See Mugavero, 2009 WL 890063, at *26; Gay v. Affourtit, 76 F. Supp. 2d 517, 519 (S.D.N.Y. 1999).

As to the fourth element, Leifer's act of making phone calls may otherwise have been lawful.  See Mugavero, 2009 WL 890063, at *26 & n.24.

18

**(4)      Intentional Infliction of Emotional Distress**

Leifer argues that Gordon "has not disclosed any objective evidence from any medical provider to substantiate his unfounded allegations of emotional distress."  (Defs. Reply at 10.) Gordon contends that he has suffered "significant mental anguish," which "has manifested itself physically by causing [him] to suffer from severe bouts of insomnia."  (Declaration of Erik H. Gordon, dated Apr. 19, 2011 ("Gordon Decl."), ¶¶ 7–8.)

Under New York law, "a claim of intentional infliction of emotional distress requires: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."  Conboy v. AT&T Corp., 241 F.3d 242, 258 (2d Cir. 2001) (internal quotation marks omitted).  "Courts routinely grant summary judgment against plaintiffs where they have failed to present medical evidence demonstrating severe emotional injury."  Biggs v. N.Y.C., No. 08 Civ. 8123, 2010 WL 4628360, at *9 (S.D.N.Y. Nov. 16, 2010).

Gordon fails to offer objective medical evidence demonstrating severe emotional distress. See Romano v. SLS Residential, Inc., --- F.Supp.2d ---, 2011 WL 2671526, at *11 (S.D.N.Y. June 22, 2011).  While Gordon claims that he "visited a physician" who "prescribed Xanax, Temezapam and Sonata," and that he "contracted an upper respiratory infection for which [he] was prescribed Augmentin and a steroid" (Gordon Decl. ¶ 8.), he offers no medical reports, doctors' affidavit(s), or any other medical evidence to support his claim.  See, e.g., Lenhoff v. Getty, No. 97 Civ. 9458, 2000 WL 977900, at *9 (S.D.N.Y. July 17, 2000) (granting summary judgment where plaintiff's emotional distress claim was not substantiated by a medical expert); Dankner v. Steefel, 47 A.D.3d 867, 868 (N.Y. App. Div. 2008).  Gordon's "mere recitation of

speculative claims" is insufficient to show severe emotional distress.  <u>Walentas v. Johnes</u>, 257

A.D.2d 352, 353 (N.Y. App. Div. 1999).  The Court need not address the remaining elements of

this claim.  <u>See</u> <u>Biggs</u>, 2010 WL 4628360, at *9.

        **(5)**        **Defendants' Cross-Claims**

        Because the Reseller Defendants are not liable under the DPPA, the Reseller Defendants'

cross-claims against Leifer for common law indemnification, contractual indemnification, and

contribution are dismissed <u>sua</u> <u>sponte</u> as moot.  <u>See</u> <u>Foremost Guar. Corp. v. Public Equities</u>

<u>Corp.</u>, No. 86 Civ. 6421, 1989 WL 82412, at *1 (S.D.N.Y. July 21, 1989).

        Leifer's cross-claims against the Reseller Defendants for common law indemnification

and contribution are also dismissed <u>sua</u> <u>sponte</u>.  In New York, a claim for common law

indemnification requires that "(1) the party seeking indemnity and the party from whom

indemnity is sought have breached a duty to a third person, and (2) some duty to indemnify

exists between them."  <u>Perkins Eastman Architects, P.C. v. Thor Engineers, P.A.</u>, 769 F. Supp.

2d 322, 329 (S.D.N.Y. 2011).  "[T]he critical requirement for a contribution claim under New

York law is that the breach of duty by the contributing party must have had a part in causing or

augmenting the injury for which contribution is sought."  <u>Id.</u> at 327.

        Leifer does not allege a single fact in support of his cross-claims against the Reseller

Defendants in the two paragraphs that constitute the entirety of his cross-claims.  (<u>See</u> Leifer's

Answer ¶¶ 1–2.)  Accordingly, Leifer fails to show the breach of any duty by the Reseller

Defendants necessary to sustain a claim for either common law indemnification or contribution

under New York law.  <u>See</u> <u>Perkins</u>, 769 F. Supp. 2d at 329.

**V.      Conclusion & Order**

For the foregoing reasons, Defendants' motion for summary judgment [#77] is granted in part and denied in part as follows:

(i)      Summary judgment as to Leifer's liability to Gordon under the DPPA is denied;

(ii)     Summary judgment as to the Reseller Defendants' liability under the DPPA is granted in favor of the Reseller Defendants;

(iii)    Summary judgment as to Gordon's prima facie tort claim against Leifer is denied; and

(iv)     Summary judgment as to Gordon's intentional infliction of emotional distress claim against Leifer is granted in favor of Leifer;

Plaintiff's cross-motion for summary judgment on his DPPA claims against Leifer and the Reseller Defendants [#83] is denied; the Reseller Defendants' cross-claims against Leifer [#63, #64] are dismissed; and Leifer's cross-claims against the Reseller Defendants [#66] are dismissed.

The parties are directed to appear for a pre-trial conference before the Court on December 14, 2011 at 9:00 a.m.  The parties are directed to engage in good-faith settlement discussions prior to the conference.

Dated: New York, New York
        November 30, 2011

$\overline{\qquad\qquad\qquad\qquad\qquad}$
**RICHARD M. BERMAN, U.S.D.J.**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/30/11

21